**THE LIMITED, INC. Plaintiff,**

v.

**McCRORY CORPORATION, Rapid–American Corporation, Rapid–American Holding Corporation, Touche Ross & Co., DBG Financial Company, Meshulam Riklis, Harold S. Divine, Bernard J. Blaney, Stephen L. Pistner, Arthur E. Strickman, Arnold Broser and Steven J. Greene, Defendants.**

No. 85 Civ. 7444 (RLC).

United States District Court,
S.D. New York.

April 7, 1988.

Parker Chapin Flattau & Klimpl, New York City (Alvin M. Stein, Mark Abramowitz, Stephen F. Harmon, Katherine C. Ash of counsel), for plaintiff.

Gibson Dunn & Crutcher, New York City (Walter L. Stratton, John T. Behrendt, Mitchell A. Karlan, Dvora Wolff Rabino, of counsel), for defendant Touche Ross & Co.

Rubin Baum Levin Constant & Friedman, New York City (Stephen A. Marshall, of counsel), for defendants McCrory Corp., Rapid–American Corp., Rapid–American Holding Corp, Meshulam Riklis, Bernard J. Blaney and Stephen L. Pistner.

Pollack & Kaminsky, New York City (Daniel A. Pollack Martin I. Kaminsky, of counsel), for defendants DBG Financial Co., Harold S. Divine, Arnold Broser and Steven J. Greene.

Gelberg & Abrams, New York City (Michael Luskin, of counsel), for defendant Arthur E. Strickman.

## OPINION

ROBERT L. CARTER, District Judge.

## BACKGROUND

In the early fall of 1984, The Limited, Inc., a corporation that operates a national chain of approximately 800 retail stores selling women's and children's apparel, entered negotiations to purchase all of the issued and outstanding stock of Lerner Stores Corporation ("Lerner"). The sellers were a collection of three corporations: McCrory Corp. ("McCrory"), which prior to April 2, 1985, owned all of the issued and outstanding stock of Lerner; Rapid–American Corp. ("Rapid–American"), of which McCrory is a wholly owned subsidiary; and Rapid–American Holding Corp. ("Holding"), of which Rapid–American is a wholly owned subsidiary. Collectively, these corporations constituted the Selling Group.

Meshulam Riklis, Harold S. Divine, Bernard J. Blaney, Arnold Broser, and Stephen L. Pistner, all individual defendants, participated in the stock-sale negotiations.[1] Drexel Burnham Lambert, Inc. ("Drexel"), a non-party, acted as advisor and agent to Riklis, Riklis's staff, and the Selling Group.

In February, 1985, plaintiff and the Selling Group executed a Memorandum of Understanding. The Memorandum set forth the key provisions of the proposed stock sale and established a purchase price "equal to $160 million in excess of the audited shareholder's equity as of January 31, 1985." Amended Complaint, ¶ 22. The equity figure was to be based upon the "audited balance sheet certified by Touche Ross & Co. ["Touche"] in accordance with [generally accepted accounting principles] and on a basis consistent with the January 31, 1984 consolidated financial statements, which January 31, 1985 balance sheet shall be final and binding on all parties." *Id.*

Plaintiff and the Selling Group executed a stock purchase agreement on April 2, 1985. At the closing, Touche delivered a copy of Lerner's certified financial statements and the auditor's report to plaintiff, which had already been assured by Drexel and by the Selling Group's counsel that Lerner's inventory valuation would be "squeaky clean." *Id.,* ¶ 25.

In this action, The Limited alleges that the financial statements on which it relied were materially false and misleading in at least three respects. First, the statements failed to disclose that the recorded value of Lerner's inventory was greatly inflated because of a change in its inventory markdown policies. Second, the statements did not disclose that a two-year equipment lease between Lerner's wholly owned subsidiary, Associated Lerner Shops of America ("ALSA"), and DBG Financial Company, a partnership consisting of defendants Divine, Broser, and Greene, had been extended for a period of almost twenty years at an additional rental liability of approximately $28 million. Third, the statements did not disclose Lerner's purported liability to Rapid–American for $1.3 million in insurance assessments stemming from Rapid–American's purchase of workers' compensation insurance for Lerner and other companies. As a result, plaintiff claims, it overpaid for the stock and has sustained recurring consequential losses. Plaintiff's Br. at 4–5.

## THE PREVIOUS OPINION AND THE AMENDED COMPLAINT

Most of the allegations in this case have been set forth previously and need not be elaborately restated here. *See The Limited, Inc. v. McCrory Corp.,* 645 F.Supp. 1038 (S.D.N.Y.1986) (Carter, J.), with which familiarity is assumed.

In August, 1986, the court dismissed the complaint in its entirety. Plaintiff's claims under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder ("Rule 10b–5"), 17 C.F.R. § 240.10b–5 (1987), Section 17(a) of the Securities Act of 1933 ("Section 17(a)"), 15 U.S.C. § 77q(a), and the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961–1968, failed to plead fraud with the particularity required by Rule 9(b), F.R.Civ.P.[2] *See The*

---

1. Riklis was chairman of the board, chief executive officer, and president of Rapid–American, and, until Feb. 1, 1985, chairman of the board, chief executive officer, and president of McCrory. He also was the sole actual or beneficial owner of the Selling Group corporations. Divine was vice-chairman of the board of Rapid–American, director and executive vice-president of McCrory, and a general partner of DBG. Blaney was a director, vice-president, and treasurer of both Rapid–American and McCrory. Broser was a vice-president of Holding, a trustee of the McCrory Pension plan, a consultant to McCrory, and a general partner of DBG. Pistner was a director and senior vice-president of Rapid–American, and chairman of the board, chief executive officer, and president of McCrory. (Strickman, a director of McCrory and chairman of the board, chief executive officer and president of Lerner and of ALSA, and Greene, the president and chief executive officer of a McCrory subsidiary and a general partner of DBG, also are charged as individual defendants.) Amended Complaint, ¶¶ 9–15.

2. Rule 9(b), F.R.Civ.P., states that "[in] all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

*Limited, Inc., supra,* 645 F.Supp. at 1042–47. Having failed to plead a proper Section 10(b) claim, plaintiff was not entitled to proceed with its claim under Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a). Its state-law claims were dismissed for lack of jurisdiction, and plaintiff was granted leave to replead.

The amended complaint exceeds 70 pages and contains nine claims: The Selling Group, Riklis, and Touche are charged with primary violations of Section 10(b) and Rule 10b–5. The seven individual defendants, along with DBG and Touche, are charged with aiding and abetting those alleged violations. Each defendant is charged with violating Section 17(a). Each individual defendant is charged with liability as a controlling person under Section 20(a). Riklis and Divine are charged with violating Section 1962(c) of RICO. Finally, in a series of state-law claims, the complaint charges Touche with common-law negligence; each defendant with common-law fraud; and each defendant with liability under Section 352–c of New York's General Business Law ("the Martin Act"). N.Y.Gen.Bus.L. § 352–c (McKinney 1984). Plaintiff seeks compensatory damages, punitive damages, treble damages under its RICO claim, and costs.

The amended complaint differs in several respects from the original: (1) It charges only defendants Riklis, the Selling Group, and Touche with primary violations of Section 10(b) and Rule 10b–5, and alleges that all individual defendants, along with DBG and Touche, were aiders and abettors; (2) it includes Touche among those defendants charged with violating Section 17(a); (3) it interposes a RICO charge against only Riklis and Divine, not, as previously, against all defendants except Touche; (4) it asserts a common-law fraud claim against all defendants and, on the basis of this new claim, seeks $25 million in punitive damages; and (5) it invokes a new theory of misrepresentation—the nondisclosure of the insurance assessments liability. More generally, the amended complaint no longer charges defendants with the same acts of wrongdoing. It attempts to remedy its previous deficiencies by distinguishing among defendants and specifying those aspects of the alleged fraud in which each participated.

As before, Touche moves for dismissal under Rules 9(b) and 12(b), F.R.Civ.P. The remaining defendants jointly move for dismissal on the same grounds and for partial summary judgment pursuant to Rule 56, F.R.Civ.P. Defendants DBG and Greene join in the foregoing motion but state additional grounds for dismissal as to them.

## MOTIONS TO DISMISS THE AMENDED COMPLAINT

It is "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972) (per curiam). Thus, the court must construe the allegations of the complaint favorably to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *cf. Joyce v. Joyce Beverages, Inc.,* 571 F.2d 703, 706 (2d Cir.) (plaintiff's allegations must be accepted as true), *cert. denied,* 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978). Even if it appears "on the face of the pleadings that a recovery is very remote and unlikely[,] ... that is not the test." *Scheuer, supra,* 416 U.S. at 236, 94 S.Ct. at 1686; *see First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.,* 634 F.Supp. 1341, 1353 (S.D.N.Y.1986) (Lasker, J.) "The issue is ... whether the claimant is entitled to offer evidence to support the claims." *Scheuer, supra,* 416 U.S. at 236, 94 S.Ct. at 1686.

### I. Touche's Motion

Plaintiff alleges that Touche, as Lerner's auditor, knew that Lerner's inventory was overvalued and deliberately or recklessly failed to correct the overstatement, *see* Amended Complaint, ¶¶ 96–100; knew of the purported lease extension but failed to disclose its existence, *see id.,* ¶¶ 101–104;

and was negligent in failing to discover Lerner's purported liability for the insurance assessments. *See* Plaintiff's Br. at 17 n. 7. Touche argues that plaintiff is not entitled to offer proof of these assertions because there has been no allegation of actual damages.

### A. Damages

Proof of actual damages is essential to each of the claims asserted against Touche. *E.g.,* 15 U.S.C. § 78bb(a) (limiting recovery under the Exchange Act to "actual damages"); *Ostano Commerzanstalt v. Telewide Systems, Inc.,* 794 F.2d 763, 766 (2d Cir.1986) (under New York law, plaintiff in fraud may recover only out-of-pocket damages); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir. 1985) (Section 10(b) requires proof of injury); *Simon v. New Haven Bd. & Carton Co., Inc.,* 516 F.2d 303, 306 (2d Cir.1975) (actual damages required in Section 10(b) and Rule 10b–5 claims); *Ritchie v. Landau,* 475 F.2d 151, 156 (2d Cir.1973) (fraud entails proof of actual damages); *E.F. Hutton & Co., Inc. v. Penham,* 547 F.Supp. 1286, 1292–1293 (S.D.N.Y.1982) (Duffy, J.) (proof of damage required under Section 10(b), Section 17(a), and N.Y.Gen.Bus.L. Section 352–c); *Wolfe v. Samaritan Hospital,* 113 Misc.2d 873, 450 N.Y.S.2d 143, 144 (Sup.Ct.Albany County 1982) (negligence claim requires proof of damages). In the absence of properly alleged actual damages, plaintiff's allegations against Touche would be legally insufficient and must be dismissed.

Touche argues that actual damages have not been alleged because plaintiff "has not been and may never be injured by [the] alleged nondisclosure[ ]" of the lease-extension and insurance agreements. Touche Br. at 11–20. It is undisputed that ALSA and Lerner, plaintiff's subsidiaries, deny liability under these agreements, have paid no money pursuant to them, and are defendants in pending state-court proceed-ings brought to enforce the agreements. *See DBG Financial Co. v. Associated Lerner Shops of America, Inc.,* No. 20168/85 (Sup.Ct.N.Y. County), Tofel Aff't, Exh. D (lease extension); and *Rapid–American Corp. v. Lerner Stores Corp.,* No. 10272/86 (Sup.Ct.N.Y. County), Tofel Aff't, Exh. F (insurance agreement). Touche concludes that the agreements are disputed obligations, and that "a disputed obligation . . . does not constitute actual present damage." Touche Br. at 17.

Touche's argument evinces a fundamental misunderstanding of plaintiff's alleged damages. The Limited asserts not that it will be damaged if it is forced to honor the disputed agreements, but that it was damaged at the moment that it purchased the Lerner stock. "The Limited suffered direct damages when it paid more than it agreed to for the Lerner stock and received an asset worth less than defendants represented." Plaintiff's Br. at 4; *see* Amended Complaint, ¶¶ 34, 80. What hinges on the outcome of the state-court litigation, therefore, is not the existence of plaintiff's injury, but rather the extent of it. *Cf. Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977) (recovery may not be denied when only the amount of plaintiff's damage is uncertain).

■ Undisclosed potential liabilities, and the probability of litigation arising from such claims, reduce the value of a contemplated purchase. *See* Plaintiff's Br. at 14; *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.) (damages in fraud arise when "one is caused to buy something that one would not have bought or would not have bought at that price"), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). Thus, although plaintiff has yet to make payment under the disputed obligations, and indeed may never make payment, it has adequately alleged damages by asserting that the stock was purchased at a wrongfully inflated price.[3] Defendant's recitation of author-

---

**3.** Moreover, wrongful subjection to an uncurred liability may in itself constitute actual damage. *See Weitzman v. Stein,* 459 F.Supp. 400, 403 (S.D.N.Y.1978) (MacMahon, J.) (wrongful imposition of liability constitutes "actual damage" under anti-fraud provisions of the Exchange Act even when liability remains unsatisfied); *Johnson & Staley, Inc. v. Bushan & Levy, P.C.,* 527 F.Supp. 1159, 1162 (S.D.N.Y.1981) (Weinfeld, J.) (actual damages were properly al-

ity concerning contingent, speculative, and future damages is therefore inapposite.

■ In addition, plaintiff seeks consequential damages. Amended Complaint, ¶ 163 (iv). One who alleges fraud, at common law or under the federal securities laws, generally is entitled to such damages. *See Zeller v. Bogue Electric Mfg. Corp.*, 476 F.2d 795, 803 (2d Cir.) (Friendly, C.J.) (consequential damages available if plaintiff establishes requisite "causal nexus with a good deal of certainty"), *cert. denied*, 414 U.S. 908, 94 S.Ct. at 217, 38 L.Ed.2d at 146 (1973). Consequential damages may include out-of-pocket expenses stemming from related litigation. *See Madigan, Inc. v. Goodman*, 498 F.2d 233, 238–239 (7th Cir.1974); *Central Trust Co. v. Goldman*, 70 A.D.2d 767, 417 N.Y.S.2d 359, 361 (4th Dep't) (attorney's fees recoverable if they are "the proximate and natural consequence of defendants' tortious act which requires plaintiff to defend or bring an action against a third party"), *appeal dismissed*, 47 N.Y.2d 1008, 420 N.Y.S.2d 221, 394 N.E.2d 290 (1979). Even if The Limited ultimately is not entitled to consequential damages, *see Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir. 1986) (consequential damages limited to expenses stemming from prior related litigation between plaintiff and third party), to defeat Touche's motion "it need not appear that plaintiff can obtain the particular relief prayed for, as long as the court can ascertain that *some* relief may be granted." 5 Wright & Miller, *Federal Practice and Procedure* ¶ 1357, at 602 (1969) (emphasis added). Damages have been adequately pleaded.

## B. Rule 9(b), F.R.Civ.P.

Touche further asserts that plaintiff's inventory-markdown allegations must be dismissed for failure to comply with Rule 9(b), F.R.Civ.P. The court agrees.

■ To state a claim under Section 10(b) and Rule 10b–5, plaintiff must allege conduct indicating an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 192 n. 7, 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982). Although *scienter* may be alleged in conclusory terms, Rule 9(b), F.R. Civ.P., requires that general averments of *scienter* be accompanied by detailed factual allegations capable of supporting an inference of fraud.

■ This requirement has been held to compel plaintiffs to state the alleged facts "with sufficient particularity to apprise defendants of the misconduct complained of and to enable them to prepare a defense." *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 908–909 (S.D.N.Y.1983) (Carter, J.). The nature and extent of the detail required will vary with the circumstances of each case. *See Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 n. 98 (2d Cir.1973). In general, however, defendants must be apprised of the nature of the allegedly false statements, by whom they were made and when, in what manner the statements were false, how they misled plaintiff, and what defendants obtained as a result of the alleged fraud. *Somerville, supra*, 576 F.Supp. at 911–912 (requiring time, place, and content of alleged misrepresentations); *see Goldman v. Belden*, 754 F.2d 1059, 1069–1070 (2d Cir.1985) (Rule 9(b) satisfied when complaint specified the allegedly false statements, gave particulars as to how they were fraudulent, detailed time and place at which statements were made, and identified defendants charged with having made statements).

Perhaps most important here, "[i]t is reasonable to require that the plaintiff[ ] specifically plead those events which [it] assert[s] give rise to a strong inference that the defendant[ ] had knowledge of the facts ... or recklessly disregarded their existence." *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 558 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The original complaint failed to state "facts from which it [could] be in-

leged where plaintiff paid for stock up front and faced pending state-court action seeking the balance allegedly due). *See also Metro. Elevated Ry. Co. v. Kneeland*, 120 N.Y. 134, 24 N.E. 381 (1890); *Davison v. Farr, Ward & Co.*, 18 Misc. 124, 41 N.Y.S. 170, 171 (1896).

ferred that Touche knew of the existence of" the lease transaction and of the change in Lerner's inventory practices, *see The Limited, Inc., supra,* 645 F.Supp. at 1045, and the amended complaint fares no better.

■ The amended complaint avers merely that "[u]pon information and belief, based on statements made by Lou Lipschitz," Lerner's former controller, "Touche knew or should have known and was reckless in not ascertaining" that Lerner's inventory was materially overvalued, *see* Amended Complaint, ¶ 66, and that a "$5 million adjustment" was insufficient to correct that overvaluation.[4] *Id.,* ¶ 67. There is no indication of how or when Touche became aware of facts that made the financial statements materially misleading. Touche was not an insider at Lerner, and its knowledge cannot be inferred solely from the fact that it was Lerner's auditor. *Ross v. Warner,* 480 F.Supp. 268, 272 (S.D. N.Y.1979) (Tenney, J.) (inference of fraud does not arise from mere fact that an auditor certified an inaccurate report). Nor does the amended complaint allege facts from which it might be inferred that Touche received, or was even aware of, instructions from Riklis concerning Lerner's inventory valuation.

Plaintiff nonetheless argues that the amended complaint sufficiently alleges that Touche was reckless in not ascertaining the facts that made Lerner's financial statements misleading. *See Lanza, supra,* 479 F.2d at 1306 (Rule 10b–5 liability requires proof of willful or reckless disregard for the truth). The amended complaint avers that Touche "received clear notice of the use of irregular practices in valuing inventory," Amended Complaint, ¶ 66, and "in reckless disregard of its duties as auditor, failed to take sufficient audit steps required under generally accepted auditing standards, such as interviewing Lerner's merchandise personnel, to determine the

extent of additional markdowns which should have been ... taken." *Id.,* ¶ 97. *See* Plaintiff's Br. at 53 (Touche "deliberately closed its eyes to the facts"); *id.* at 54 (knew that Lerner acted "in contravention of past practices"); *id.* ("undertook no investigation and made no inquiries"); *id.* at 54–55 ("closed its eyes to the obvious"); *id.* at 56 (failed "to make inquiries ... [or] to test the adequacy of the $5 million reserve").

These are allegations of negligence. *See* Amended Complaint, ¶ 106 (failed "to exercise due professional care"). Reckless conduct, on the other hand, is, "at the least, ... 'highly unreasonable' and ... represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.) (citation omitted), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Even if Touche should have done more to attempt to uncover and disclose the alleged fraud, without factual allegations tending to establish knowledge of those practices on Touche's part, its "failure [to make further inquiries does] not rise above the level of negligence, which is legally insufficient." *Oleck v. Fischer,* [1979] Fed.Sec.L.Rep. (CCH) ¶ 96,898 at 95,698 (S.D.N.Y.1979) (Haight, J.), *aff'd,* 623 F.2d 791 (2d Cir.1980). "It is not enough for plaintiff to show that defendant failed to detect certain material facts when [it] had no reason to suspect their existence." *Cohen v. Franchard Corp.,* 478 F.2d 115, 123 (2d Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed. 2d 106 (1973); *see Weinberger v. Kendrick,* 451 F.Supp. 79, 83 (S.D.N.Y.1978) (Duffy, J.) (claim deficient under Rule 9(b) for failing to give "some factual indication of the extent of the accountants' knowledge").

*Arthur Andersen & Co.,* 552 F.Supp. 439, 456 n. 33 (S.D.N.Y.1982) (Goetel, J.), *rev'd on other grounds,* 726 F.2d 930 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *see IIT, An Int'l Investment Trust v. Cornfeld,* 619 F.2d 909, 924 (2d Cir.1980).

---

4. Allegations that Touche "knew or should have known" that its financial statements were false and misleading do not render the complaint deficient under Rule 9(b), F.R.Civ.P. "As a matter of pleading, ... allegations in the disjunctive, when one of the alternatives is legally sufficient, is [sic] permissible." *Chemical Bank v.*

Because plaintiff's inventory-markdown allegations fail to allege *scienter*, those allegations are dismissed as to Touche.[5]

■ By contrast, as Touche apparently concedes, *see* Touche Reply Br. at 12–13, plaintiff's allegations concerning the lease-extension satisfy Rule 9(b), F.R.Civ.P. The complaint alleges that Touche was told by a Lerner insider, Lou Lipschitz, of the existence and terms of the lease extension prior to the conclusion of the stock-purchase negotiations and prior to the execution of the stock purchase agreement. Amended Complaint, ¶ 45. Touche has thus been apprised of the details of an event that is alleged to support "a strong inference that the defendant[ ] had knowledge of the facts ... or recklessly disregarded their existence." *A.H. Robins Co., Inc., supra,* 607 F.2d at 558. Plaintiff's lease-extension allegations against Touche therefore suffice under Rule 9(b), F.R.Civ.P.[6]

### C. Private Right of Action Under Section 17(a)

■ Touche also asserts that plaintiff's Section 17(a) claim must be dismissed because that section affords no private remedy.

The availability of a private remedy under Section 17(a) has perplexed and divided the Circuits. *See, e.g., Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir.1981) (private cause of action); *Daniel v. Int'l Brotherhood of Teamsters,* 561 F.2d 1223, 1245–1246 (7th Cir.1977) (same), *rev'd on other grounds,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Newman v. Prior,* 518 F.2d 97, 99 (4th Cir.1975) (same). *But see Landry v. All*

*American Assurance Co.,* 688 F.2d 381, 387–391 (5th Cir.1982) (no private cause of action); *Shull v. Dain, Kalman & Quail, Inc.,* 561 F.2d 152, 159 (8th Cir.1977) (same), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). The United States Supreme Court has three times reserved decision on whether Section 17(a) affords a private remedy. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 378 n. 2, 103 S.Ct. 683, 685 n. 2, 74 L.Ed.2d 548 (1983); *Int'l Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557 n. 9, 99 S.Ct. 790, 795 n. 9, 58 L.Ed.2d 808 (1979); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1934 n. 6, 44 L.Ed.2d 539 (1975).

"Section 17(a) on its face simply makes it unlawful for sellers of securities to engage in fraudulent transactions or to omit to state material facts." *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1283 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Many commentators have concluded that the provision "was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability, and was never [intended] to supplement the actions for damages provided by §§ 11 and 12 [of the Securities Act of 1933]." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867 (2d Cir.1968) (Friendly, J., concurring), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Nonetheless, in *Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), the Court of Appeals for the Second Circuit found "the language of § 17 ... broad enough to

---

**5.** Counsel for Touche also urges dismissal of those portions of the amended complaint that conflict with the original complaint. Dismissal on this ground is unwarranted.

Although Touche was not originally charged with conspiring to inflate Lerner's assets and to conceal its full liabilities, *see* Original Complaint, ¶ 21, plaintiff is not precluded from now bringing Touche into that alleged conspiracy. Prior inconsistent pleadings, though admissible against plaintiff in the case in which they were originally filed as well as in any subsequent litigation involving that party, are controvertible, not conclusive, admissions. *United States*

*v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984). "A party ... cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, *safe in the belief that the trier of fact will never learn of the change in stories." Id.* (emphasis added).

**6.** There is no issue arising under Rule 9(b), F.R.Civ.P., as to the insurance agreement. Plaintiff admits that those allegations sound only in negligence. Plaintiff's Br. at 17 n. 7.

imply a private right of action." The Court relied heavily on Judge Friendly's observation in a concurring opinion in *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 867, that "[o]nce it had been established ... that an aggrieved buyer has a private action under § 10(b) of the 1934 Act, there seemed little practical point in denying the existence of such an action under § 17."

*Kirshner's* conclusion has been seriously questioned. Professor Loss argues that *Kirshner* is devoid of analysis, *see* L. Loss, Fundamentals of Securities Regulation 1149 (1983), and that "[i]f *anything* in the 1933 Act can be stated categorically," it is that Section 17(a) does not support a private right of action. *Id.* at 1148. Moreover, our own Court of Appeals has declined to reaffirm its position in *Kirshner, see Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 25 (2d Cir.1986) (declining to decide whether there is an implied private right of action under Section 17(a)), *cert. denied,* — U.S. —, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Zerman v. Ball,* 735 F.2d 15, 23 (2d Cir.1984) ("declin[ing] to opine at this stage of the case ... as to whether [a private] right of action exists" under Section 17(a)), and in fact has stated that *Kirshner's* "conclusion may be open to reexamination." *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 559 n. 3 (2d Cir.1985) (Friendly, J.).

In a well-reasoned opinion, Judge Haight recently concluded that "[t]here is [now] ample reason to think that the *Kirshner* holding is no longer valid." *Ackerman v. Clinical Data, Inc.,* [1985–86] Fed.Sec.L. Rep. (CCH) ¶ 92,207 at 91,569 (S.D.N.Y. July 8, 1985) (Haight, J.) [available on WESTLAW, 1985 WL 1884]. *Kirshner* wrongly assumed that "the recognition of a § 17 cause of action concomitant with a § 10(b) action [had] no practical significance." *Id.* at 91,570. The two provisions differ in scope and, since *Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980) (negligence suffices to establish a violation of § 17(a)(2) or § 17(a)(3)), they require differing degrees of culpability. Thus, "the recognition of a private right of action under § 17 would vitiate the limitations on § 10(b) so carefully crafted by Congress." *Ackerman, supra,* [1985–86] Fed.Sec.L.Rep. (CCH) ¶ 92,207 at 91,571. A private remedy under Section 17(a) would be similarly disruptive of the "carefully laid framework" of the Securities Act of 1933: "Section 17(a)(2) prohibits the same type of conduct as §§ 11 and 12, but has none of the limitations imposed by Congress." *Landry, supra,* 688 F.2d at 390. Those limitations would be undermined by the availability of a private remedy under Section 17(a).

Moreover, the "legislative history of § 17 cuts against an implied right of action." *Ackerman, supra,* [1985–86] Fed.Sec.L. Rep. (CCH) ¶ 92,207 at 91,571. Although *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), established a four-part test for determining when a private remedy may be inferred from a silent statute, the United States Supreme Court has indicated in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–576, 99 S.Ct. 2479, 2488–2489, 61 L.Ed.2d 82 (1979), and in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979), that the four factors to be applied are not of equal weight. "The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co., supra,* 442 U.S. at 575, 99 S.Ct. at 2489. It appears that there was no such Congressional intent with respect to Section 17(a). Numerous courts have examined the legislative history of the Securities Act of 1933 and found that Sections 11 and 12 were almost certainly intended to be the only civil-liability provisions of that statute. *See, e.g., Landry, supra,* 688 F.2d at 389–390; *Texas Gulf Sulphur Co., supra,* 401 F.2d at 867; *Citizens State Bank v. Continental Assurance Co.,* 598 F.Supp. 1111, 1115 (W.D. Wis.1984); *Kimmel v. Peterson,* 565 F.Supp. 476, 486 (E.D.Penn.1983); *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 551 F.Supp. 580, 585–587 (S.D.Ohio 1982); *Hill v. Der,* 521 F.Supp. 1370, 1376 (D.Del.1981).

The court is therefore disposed to agree with Judge Haight that:

> After *Aaron* it may no longer be said, as *Kirshner* did, that there is no practical difference between a § 17 and a § 10(b) claim. After *Touche Ross* and *Transamerica* it may no longer be said, as *Kirshner* did, that 'the language of § 17 is broad enough to imply a private right of action.'

*Ackerman, supra,* [1985–86] Fed.Sec.L. Rep. (CCH) ¶ 92,207 at 91,571. The court concludes that there is no private remedy under Section 17(a), and plaintiff's Section 17(a) claim must be dismissed as to all defendants.

### D. Private Right of Action Under the Martin Act

█ Touche's final argument is that there is no private right of action under Section 352–c of the Martin Act.

This issue must be resolved in accordance with New York law. *See* 19 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* §§ 4507, at 89; § 4515 (1982); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 540 n. 1 (2d Cir.1956) ("it is the *source* of the right sued upon, and not the ground on which federal jurisdiction ... is founded, which determines the governing law"). The holding of that state's highest court is dispositive.

Any doubt as to the availability of a private remedy under Section 352–c was recently dispelled by the New York Court of Appeals. In *CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 806, 514 N.E.2d 116, 117–18 (1987), the court unequivocally stated that "there is no [private] cause of action [expressly or] impliedly created under [S]ection 352–c." *Accord Green v. Santa Fe Industries, Inc.,* 70 N.Y.2d 244, 519 N.Y.S.2d 793, 798, 514 N.E.2d 105, 109–10 (1987); *Loengard v.*

*Santa Fe Industries, Inc.,* 70 N.Y.2d 262, 519 N.Y.S.2d 801, 803, 514 N.E.2d 113, 114–15 (1987). A majority of the court concluded

> that an implied private action [would not be] consistent with the legislative scheme underlying the Martin Act and, specifically, [S]ection 352–c; [and] that the specific purpose of the statute was to create a statutory mechanism in which the Attorney–General would have broad regulatory and remedial powers to prevent fraudulent securities practices by investigating and intervening ... and, thereafter, if appropriate, [commencing] civil or criminal prosecution....

*CPC Int'l, Inc., supra,* 519 N.Y.S.2d at 807, 514 N.E.2d at 119. Although the court was unanimous in its belief that a private cause of action was desirable, legislative intent required a finding that "the particular purpose of [S]ection 352–c is the creation of an enforcement mechanism within which a private action is not implied." *Id.* at 808, 514 N.E.2d at 119. Accordingly, plaintiff's Section 352–c claim is dismissed as to all defendants.[7] *See Feinberg v. Leighton,* [1986–87] Comm.Fut.L. Rep. (CCH) ¶ 23,460 at 33,232 (S.D.N.Y. Jan. 30, 1987) (Cedarbaum, J.) [available on WESTLAW, 1987 WL 6147].

### II. Other Defendants' Motion

The remaining defendants contend that the RICO claim against Riklis and Divine must be dismissed for failure to allege the required "pattern" of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).[8]

Plaintiff alleges that Riklis and Divine engaged in such a "pattern" by making a series of misrepresentations in furtherance of the Lerner stock sale. The amended complaint characterizes these statements as discrete unlawful acts. Thus, Riklis is alleged to have engaged in a "pattern" of

---

7. Touche also argues that any implied right of action under Section 352–c must be limited to suits between buyers and sellers of securities. The court need not reach this question in light of its holding that no private remedy exists under Section 352–c.

8. The statute provides that a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

racketeering activity by: (1) instructing Lerner to create a $5 million "reserve" fund when he knew or should have known and was reckless in not ascertaining that Lerner's inventory value had been overstated by at least $13.7 million; (2) approving the lease extension in contemplation of the stock sale; (3) mailing to plaintiff, through Drexel, Lerner's draft and certified financial statements when he knew that they were materially false and misleading; and (4) falsely representing in paragraph 4.5.1 of the stock purchase agreement that Lerner had "carried on its business in substantially the same manner" from February 1, 1985, through April 2, 1985, when in fact Riklis knew that Lerner had taken unprecedented permanent markdowns that should have been, but were not, taken before January 31, 1985. Amended Complaint, ¶ 147(a)–(f). These acts allegedly constituted mail fraud and violated Section 10(b).

Furthermore, Divine is alleged to have engaged in a "pattern" of racketeering activity by: (1) instructing Lerner not to exceed its inventory markdown budget when he knew or should have known and was reckless in not ascertaining that Lerner's inventory would thereby be overvalued by at least $13.7 million; (2) failing to disclose to plaintiff both the existence and the effect of these instructions on Lerner's recorded inventory value; (3) executing and concealing the lease extension in contemplation of the stock sale; and (4) failing to correct the misrepresentations contained in Lerner's financial statements. *Id.,* ¶ 151(a)-(d). These acts allegedly violated Section 10(b).

Plaintiff avers that, through the foregoing acts, Riklis and Divine violated RICO's Section 1962(c), which renders it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of

unlawful debt." 18 U.S.C. § 1962(c). Rapid–American, McCrory, Lerner, and the Selling Group are the alleged RICO enterprises.[9] Riklis and Divine contend that, even if these entities were RICO enterprises, no pattern has been alleged because plaintiff's allegations concern merely a "single buy-sell transaction." Defendants' Br. at 44.

Although a meaningful definition of "pattern" has at times seemed to elude Congress and the federal courts, *see Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (attributing excesses under civil RICO in part to failure of Congress and the courts to .develop a meaningful concept of "pattern"), it is now well-established within this Circuit that predicate acts that are part of a single plan may constitute a RICO pattern. Beginning with *United States v. Ianniello,* 808 F.2d 184, 191 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), our Court of Appeals has held that "an enterprise with 'a single purpose,' here fraud continuing indefinitely, can provide the basis for a section 1962(c) violation." The Court has repeatedly reaffirmed its position that proof of a "pattern" does not require evidence that a defendant engaged in more than one unlawful episode or scheme. *See United States v. Benevento,* 836 F.2d 60, 72 (2d Cir.1987) (rejecting "the view that a pattern of racketeering activity or a racketeering enterprise must consist of multiple ventures or plans"); *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 51 (2d Cir.1987) (it was error to interpret "pattern" to require multiple episodes), *cert. denied,* —— U.S. ——, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). "So long as the defendants commit at least two predicate acts, they have met the pattern requirement." *Benevento, supra,* 836 F.2d at 72; *see Beck, supra,* 820 F.2d at 51 ("two related predicate acts will suffice to establish a pattern"). The amended complaint satisfies this requirement by averring against

---

9. An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

each defendant at least two predicate acts committed in furtherance of the sale.

More is needed, however, to establish a violation of Section 1962(c). In *Sedima, S.P.R.L., supra,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, the Court, in language that our Court of Appeals concluded did not "rise to the level of holding," *Ianniello, supra,* 808 F.2d at 190, declared that "two isolated acts of racketeering activity do not constitute a pattern." According to the *Sedima* Court, this conclusion followed from the fact that RICO was not intended to "target ... sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Sedima, S.P.R.L., supra,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting S.Rep. No. 91–617, at 158 (1969)).

The notion of "continuity plus relationship" has been given effect in this Circuit primarily through the concept of a RICO "enterprise." *See Beck, supra,* 820 F.2d at 51 (quoting *Sedima, S.P.R.L., supra,* 105 S.Ct. at 3285 n. 14). "This circuit requires that, under section 1962(c), the enterprise be a *continuing* operation and that the [alleged predicate] acts be *related* to the common purpose" of the enterprise. *Ianniello, supra,* 808 F.2d at 191 (emphasis added); *see Albany Ins. Co. v. Esses,* 831 F.2d 41, 44 (2d Cir.1987). The requirements of "continuity" and "relatedness" have sometimes been incorporated into the "pattern" element. *See United States v. Coonan,* 839 F.2d 886, 889 n. 3 (2d Cir. 1988) (claiming to have "decided at least one thing with certainty: Two racketeering acts, if committed in furtherance of the affairs of an enterprise, suffice without more to constitute a pattern"). But whether one looks for "continuity" and "relatedness" in the alleged pattern or in the alleged enterprise "is really a matter of form, not substance." *Beck, supra,* 820 F.2d at 51. "Relatedness" and "continuity" must be alleged if the RICO claim is to stand.

Plaintiff's allegations are deficient for lack of any averment that the purported unlawful acts were committed in furtherance of a continuing RICO enterprise. A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Its existence is "proved by evidence of an *ongoing* organization, formal or informal, and by evidence that the various associates function as a *continuing* unit." *Id.* (emphasis added). With respect to the Selling Group, there is no averment that the organization existed for more than one finite purpose: the negotiation of the Lerner stock sale. "At the conclusion of [that] sale, the alleged enterprise ceased functioning." *Beck, supra,* 820 F.2d at 51. The Selling Group therefore cannot have been a RICO enterprise.

The remaining alleged enterprises— McCrory, Rapid–American, and Lerner— were ongoing organizations whose associates functioned as a continuing unit, but, unless their allegedly unlawful "common purpose" had no "obvious terminating goal or date," they were not RICO enterprises. *Ianniello, supra,* 808 F.2d at 191–192. The factor of "continuity plus relationship" has been held to require that plaintiff "establish the existence of an enterprise whose illicit activities or unlawful goals are continuing ones." *Creative Bath Products, Inc. v. Conn. Gen. Life Ins. Co.,* 837 F.2d 561 (2d Cir.1988). In this case, the named entities had an obvious terminating goal—the fraudulent inducement of plaintiff's stock purchase. "There is nothing in [the] amended complaint that indicates a threat of continuing [unlawful] activity beyond this terminating goal." *Albany Ins. Co., supra,* 831 F.2d at 44. Thus, plaintiff has inadequately alleged that McCrory, Rapid–American, and Lerner were RICO enterprises.

Our Court of Appeals has affirmed the dismissal of other similarly deficient complaints. In *Beck, supra,* the Court affirmed the dismissal of an amended complaint that alleged multiple predicate acts

of mail and wire fraud in the sale of bond-holders' collateral. The Court concluded that "the enterprise alleged by plaintiffs had but one straightforward, short-lived goal—the sale of the U.S. collateral at a reduced price. At the conclusion of the sale, the alleged enterprise ceased functioning." *Beck, supra,* 820 F.2d at 51. The complaint therefore failed to allege an enterprise that was "sufficiently continuing" to satisfy the requirements of 18 U.S.C. §§ 1961(4) and 1962(c). *Id.*

Similarly, in *Albany Ins. Co., supra,* the Court affirmed the dismissal of an insurer's complaint against a former policyholder who had been convicted of mail fraud in connection with the submission of a false insurance claim. The Court found that the policyholder and his principal did not constitute a "continuing" enterprise. Comparing the facts before them to those present in *Ianniello,* the Court wrote: "Whereas the purpose of the enterprise alleged in *Ianniello*—skimming profits—had 'no obvious terminating goal or date,' ... the purpose of the enterprise alleged [here] had an 'obviously terminating goal or date'—inducing the insurer ... to pay a false insurance claim." *Albany Ins. Co., supra,* 831 F.2d at 44. The "enterprise" requirement was not met when "nothing in [the] amended complaint ... indicate[d] a threat of continuing criminal activity beyond this terminating goal." *Id.*

Most recently, in *Creative Bath Products, Inc., supra,* the Court affirmed the dismissal of an amended complaint on facts similar to those at hand. Plaintiffs alleged that a licensed insurance agent who had sold them life insurance policies made three false representations in connection with the sale: (1) He falsely assured them that the policies could be returned at any time without penalty; (2) He inserted into the application a statement that new policies were not replacing older ones, while knowing that statement to be false, and allowed the application to be processed through the mails and wires; and (3) He told plaintiffs

that their policies would have substantial cash surrender value at the end of the first year when in fact they did not.

The district court found that plaintiffs had failed to allege more than a single scheme involving a single transaction and therefore could not establish the requisite "pattern." The Court of Appeals, while concluding that this ruling was probably error, nonetheless found the amended complaint properly dismissed. The "plaintiffs' case consisted of the proposition that defendants had made three fraudulent representations in pursuit of a single short-lived goal, i.e., the sale to Creative Bath and its affiliated company of the four insurance policies...." *Creative Bath Products, Inc.,* 837 F.2d at 564. Unable to distinguish that RICO claim "in any meaningful way" from those dismissed in *Beck* and *Albany,* the Court affirmed the judgment of dismissal. *Id.*

This court finds plaintiff's RICO claim similarly indistinguishable from those deemed deficient in *Beck, Albany,* and *Creative Bath Products;* therefore, the RICO claim against Riklis and Divine is dismissed.[10]

### III. DBG's and Greene's Motion

Defendants DBG and Greene argue that the aiding-and-abetting and controlling-person allegations against them are legally insufficient and must be dismissed.

### A. Claims Against DBG

■ DBG is a partnership consisting of defendants Divine, Broser, and Greene, each of whom was also an officer, director, or key employee of Rapid–American, McCrory, or a McCrory subsidiary.[11] Amended Complaint, ¶ 8. Plaintiff contends that DBG is liable as an aider and abettor on two grounds: (1) DBG, as an entity, aided and abetted primary violations of Section 10(b) and Rule 10b–5 by Riklis and the Selling Group; (2) DBG is liable for

**10.** Other arguments for dismissal advanced by the remaining defendants have been thoroughly addressed above and need not be reconsidered here.

**11.** *See supra* note 1.

the actions of its individual partners, one or more of whom aided and abetted the alleged primary violations.

In support of the first theory, plaintiff alleges that DBG, along with others, acting in contemplation of the proposed stock sale, agreed to the lease extension without obtaining the prior approval of ALSA's or Lerner's board, while knowing that such approval had been required prior to execution of the original lease. *Id.*, ¶ 92. Thereafter, DBG allegedly decided to conceal the lease extension from plaintiff. *Id.*, ¶ 38.

■ These allegations fail to support a claim of aiding-and-abetting liability against DBG. There are three prerequisites to such liability: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *IIT, An Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980). DBG appears to concede the sufficiency of allegations as to the first two elements. With respect to the third, however, it correctly argues that substantial assistance has not been alleged.

■ DBG's decision to extend the lease cannot by itself constitute substantial assistance. The lease extension could not have been concealed had DBG not extended the lease, but the lease extension was in that sense merely a "but for" cause of the primary fraud. "But for" causation does not satisfy the substantial-assistance requirement. *Bloor, supra*, 754 F.2d at 62–63; *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979), *cert. denied*, 444 U.S. 1045 (1980). Aiding-and-abetting liability requires proof that "[plaintiff's] injury was ... a direct or reasonably foreseeable result of the conduct." *Bloor, supra*, 754 F.2d at 63. The amended complaint fails to allege facts from which it might be inferred that nondisclosure of the lease extension was a direct or reasonably foreseeable result of the lease extension.

The complaint is similarly deficient in alleging DBG's failure to obtain prior board approval or to inform plaintiff of the lease extension. Inaction qualifies as substantial assistance only where a duty has been breached or where defendant acted with the requisite *scienter*. In this Circuit, "if the alleged aider and abettor owes a fiduciary duty to the plaintiff, recklessness is enough [to establish liability]. If there is no fiduciary duty, the 'scienter' requirement scales upward—the assistance rendered must be knowing and substantial." *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983) (citations omitted). Specifically, inaction ordinarily "should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Id.*

The amended complaint does not allege that DBG owed a fiduciary duty to plaintiff. Nor does the court discern any basis for inferring such a duty. A duty of disclosure "arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. U.S.*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980). There is no indication of a "relation of trust and confidence" between DBG and The Limited. *Id.* DBG's dealings were with ALSA, not with The Limited. Any fiduciary duty of disclosure to plaintiff was owed by those actually negotiating the stock sale. In the absence of such a duty, plaintiff must allege that DBG's inaction was "designed intentionally to aid the primary fraud." *Armstrong, supra*, 699 F.2d at 91. Plaintiff's allegations fail to meet this standard.

Plaintiff argues that aiding-and-abetting liability may nonetheless be imputed to DBG as a result of the actions of its partners, Divine and Broser, who allegedly "acted on behalf of DBG and within the scope of their authority as partners" in causing DBG to extend the lease and to conceal the extension from plaintiff. Amended Complaint, ¶¶ 93, 51. As shown above, however, the extension of the lease was merely a "but for" cause of the primary fraud and does not constitute sub-

stantial assistance. Even if Divine and Broser knew that the lease extension was being concealed, and even if that knowledge is properly imputed to DBG, *see* N.Y. Partnership L. § 23 (McKinney 1948), the partners' failure to make disclosure to the plaintiff constitutes substantial assistance only if it violated a duty owed to plaintiff or if its conduct was "designed intentionally to aid the primary fraud." *Armstrong, supra,* 699 F.2d at 91.

■ Plaintiff avers that Divine and Broser owed plaintiff a duty of disclosure. *See* Amended Complaint, ¶ 54. But any such duty was owed to plaintiff in the partners' capacities as officers or directors of the Selling Group, not in their capacities as partners of DBG. Under New York law, "a partnership is only liable for the acts of a partner when those acts were performed in the usual course of the partnership business" or on behalf of the partnership. *McDonnell v. Am. Leduc Petroleums, Ltd.,* 456 F.2d 1170, 1187 (2d Cir. 1972) (refusing to hold partnership liable for acts of individual partner not undertaken "on behalf" of partnership). *Cf. Northwestern Nat'l Bank of Minneapolis v. Fox & Co.,* 102 F.R.D. 507, 512 (S.D.N.Y. 1984) (Lowe, J.) (partners may be jointly and severally liable under securities laws for fraud committed by co-partners in the course of partnership business). DBG may not be held liable for acts of its partners taken as officers or directors of the Selling Group defendants. As for plaintiff's allegations of *scienter,* they are insufficient to establish that Divine and Broser, acting in their capacities as DBG partners, intended to aid the primary fraud by concealing the lease extension.

In sum, plaintiff has failed to allege adequately that DBG as an entity substantially assisted the primary fraud, or that Divine and Broser did so in their capacities as DBG partners. Therefore, the aiding-and-abetting allegations against DBG must be dismissed.

### B. Claims Against Greene

The only basis for the aiding-and-abetting allegations against Greene is that he,

"as a general partner of DBG, is liable for the acts, omissions and violations of DBG and of his fellow partners, Broser and Divine." Amended Complaint, ¶ 94. Because plaintiff has failed to allege aiding-and-abetting liability against DBG or against Broser and Divine in their capacities as DBG partners, it has failed to allege aiding and abetting against Greene. Accordingly, the aiding-and-abetting claim against Greene is dismissed.

■ Greene is also charged with "controlling person" liability under Section 20(a) for the acts of DBG. Amended Complaint, ¶ 130. Section 20(a) provides that: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person" unless defendant establishes a good-faith defense. 15 U.S.C. § 78t(a). DBG is charged under the Securities Exchange Act only as an aider and abettor. Because plaintiff has not adequately alleged that DBG is liable as an aider and abettor, Greene cannot be held accountable as a controlling person of DBG. The Section 20(a) claim against him must be dismissed.

### MOTION FOR PARTIAL SUMMARY JUDGMENT

■ All defendants except Touche seek partial summary judgment on the ground that plaintiff has failed to make a sufficient showing that it sustained actual damage as a result of the nondisclosure of the insurance and lease-extension liabilities. Summary judgment is mandated against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Plaintiff's showing is not inadequate.

As discussed above, the existence of actual damages in this case hinges not on whether the disputed agreements must be honored, but on whether the agreements diminished the value of Lerner at the time

of purchase.[12] Even if the disputed agreements ultimately are not enforceable against The Limited, plaintiff is entitled to offer evidence at trial that it would have paid less for the stock had it known of the potential liabilities that encumbered it. Defendants fail to recognize this distinction. Their evidence is directed solely toward establishing that the agreements at issue are disputed, not toward refuting the effect those agreements had on the value of the stock at the moment that it was purchased. Defendants have therefore failed to preclude the possibility that plaintiff overpaid for the stock.

By contrast, plaintiff has produced affidavits showing that it was damaged out-of-pocket at the time of purchase. *See* Morosky Aff't, ¶ 7. Plaintiff estimates that it overpaid for the stock by at least $6.7 million because of the concealed lease-extension, and by at least $1.3 million because of the concealed insurance obligation. *Id.*, ¶ 6. Plaintiff has therefore established a triable issue as to damages, and defendants' motion for partial summary judgment is denied.

**CONCLUSION**

In sum, plaintiff's Section 17(a) and Section 352–c claims are dismissed as to all defendants because those statutory provisions afford no private right of action. Plaintiff's RICO claim against Riklis and Divine is dismissed on the ground that no RICO enterprise has been adequately alleged. The Section 10(b) and Rule 10b–5 allegations against Touche concerning Lerner's inventory-markdown practices are dismissed as insufficient under Rule 9(b), F.R. Civ.P. Plaintiff's aiding-and-abetting allegations against DBG and Greene are dismissed for failure to allege substantial assistance of the primary fraud. In the absence of adequate allegations of aiding and abetting against DBG, plaintiff's Section 20(a) claim against Greene as a controlling person of DBG must be dismissed. Plaintiff's pendent claims of fraud against all defendants and negligence against Touche

need not be dismissed; the court retains jurisdiction over the federal claims that have survived the instant motions. Finally, the motion for partial summary judgment advanced by all defendants except Touche is denied because plaintiff has adequately established a triable issue as to damages.

With respect to plaintiff's deficient RICO and inventory-markdown allegations, there remains the issue of leave to replead. Although leave to replead ordinarily is freely given, *see* Rule 15(a), F.R.Civ.P.; *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the court is not persuaded that justice requires so here. "[I]n dismissing the initial complaint, [the court] ... put plaintiff's counsel on the plainest notice of what was required" under Rule 9(b), F.R. Civ.P., and RICO. *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir.1978) (Friendly, J.). This is not a case, therefore, in which plaintiff "was unaware of the deficiencies in [its] complaint when [it] first amended it." *Id.* Leave to replead those allegations is therefore denied. *See Decker, supra*, 681 F.2d at 115 (no abuse of discretion in district court's refusal to grant plaintiff a third attempt to restate defective allegations); *cf. Armstrong, supra*, 699 F.2d at 93–94 (denial of fourth attempt to replead not an abuse of discretion).

IT IS SO ORDERED.

---

**12.** Success in the state-court proceedings would merely "mitigat[e] the size of losses suffered by The Limited." Morosky Aff't, ¶ 6. It would

"not obviate the fact that The Limited suffered some damages on the date of the sale and substantial consequential losses thereafter." *Id.*